UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT WEEKS,                          )
                                       )
                Plaintiff,             )
                                       )        No. 15 C 5234
        v.                             )
                                       )        Chief Judge Rubén Castillo
LESLIE WARDEN, *et al.*,               )
                                       )
                Defendants.            )

## MEMORANDUM OPINION AND ORDER

Robert Weeks ("Plaintiff") brings this action under 42 U.S.C. § 1983 against three

employees of Stateville Correctional Center ("Stateville")—Sergeant Leslie Warden, Officer

Darrel Barry, and Lieutenant Bryan Sullivan ("Defendants")—alleging violations of his First and

Eighth Amendment rights. (R. 11, Am. Compl.) Defendants move for summary judgment on all

claims. (R. 55, Mot.) For the reasons stated below, the motion is granted.

## RELEVANT FACTS

Plaintiff is an inmate in the custody of the Illinois Department of Corrections ("IDOC").

(R. 70, Pl.'s Resp. to Facts ¶¶ 1, 9-10.)[1] He has a history of mental health issues and has been

diagnosed as having "polysubstance dependence" with "antisocial features," among other

---

[1] In responding to Defendants' proposed facts, Plaintiff did not comply with Northern District of Illinois
Local Rule 56.1(b)(3)(A), which requires that each response contain a "concise summary of the paragraph
to which it is directed." (*See* R. 70, Pl.'s Resp. to Facts.) This has created additional work for the Court,
but in order to avoid further delay, and in deference to the fact that Plaintiff's counsel is serving by
appointment, the Court has declined to strike this document.

impairments, and has at times had auditory hallucinations.[2] (R. 73, Defs.' Resp. to Add'l Facts ¶ 1.) He takes a number of medications for these issues. (*See* R. 72, Mental Health Progress Notes 12-14; R. 56-2, Pl. Dep. Tr. at 13-16.) In February 2013, Plaintiff was transferred from Pontiac Correctional Facility to Stateville, where he was to be housed in the segregation unit, also known as "F-House." (R. 70, Pl.'s Resp. to Facts ¶¶ 9-10.) When an inmate is transferred into the segregation unit, they are evaluated by a board of prison officials to determine whether they are eligible to have a cellmate, and an "Offender Special Placement Double Cell Assessment" form is completed for each inmate. (*Id.* ¶ 11.)[3] The forms for each inmate are kept in a binder for lieutenants, majors, and shift commanders to refer to when determining the proper cell placement for inmates who are assigned to the unit. (*Id.*) An assessment was completed for Plaintiff upon his transfer to Stateville's segregation unit, and it was determined that he was eligible to be placed in a cell with another inmate. (*Id.* ¶ 12.) This determination was made by a

---

[2] The parties dispute the exact nature of Plaintiff's medical diagnosis. (*See* R. 73, Defs.' Resp. to Add'l Facts ¶ 1.) A notation by a medical professional at Pontiac Correctional Facility from February 2013 states, "I think schizoaffective disorder bipolar type is the best label at this time." (R. 72, Mental Health Progress Note at 12.) Defendants admit that this notation exists but dispute whether it constitutes a formal diagnosis of schizoaffective disorder. (*See* R. 73, Defs.' Resp. to Add'l Facts ¶ 1.) The Court has presumed for purposes of this motion that Plaintiff suffers from this disorder, but it does not impact the outcome of the motion.

[3] In response to Defendants' proposed facts in paragraphs 11, 13, 14, and 15, Plaintiff states that that he has "insufficient knowledge to admit or deny." (R. 70, Pl.'s Resp. to Facts ¶¶ 13-15.) This is not a proper way to respond at the summary judgment stage. Instead, a party opposing summary judgment must admit or deny each proposed fact, and "in the case of any disagreement" must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. ILL. L.R. 56.1(b)(3)(B). Unless a proposed fact is controverted in this manner, it is deemed admitted. *Id.* Federal Rule of Civil Procedure 56(d) provides an avenue for a non-moving party to claim insufficient knowledge, but it requires the party to "show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" FED. R. CIV. P. 56(d). Plaintiff did not provide any such affidavit or declaration. Under these circumstances, these proposed facts are deemed admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) (holding that district court properly deemed facts admitted where opposing party failed to comply with Local Rule 56.1 by offering boilerplate objections rather than providing a clear denial and specific citations to evidence in the record); *Apex Med. Research, AMR, Inc. v. Arif*, 145 F. Supp. 3d 814, 821 (N.D. Ill. 2015) (deeming facts admitted where party opposing summary judgment asserted generally that he had "insufficient knowledge" to respond).

member of the medical staff, a member of the mental health staff, and a member of the internal affairs staff. (R. 56-3, Double-Cell Assessment at 3; R. 72, Sullivan Dep. Tr. at 54.) The prison's chief administrative officer, the warden, then made the final decision to approve Plaintiff for double-celling. (R. 56-3, Double-Cell Assessment at 3; R. 72, Sullivan Dep. Tr. at 55.)

Between February 2013 and September 2013, Plaintiff had six different cellmates during portions of his time in segregation. (R. 56-3, Double-Cell Assessment at 4; R. 72, Sullivan Dep. Tr. at 48-49.) As of September 22, 2013, however, he did not have a cellmate. (R. 70, Pl.'s Resp. to Facts ¶ 10.) At approximately 6:30 a.m. that morning, inmate LaDarryl House was brought to the segregation unit due to an incident that occurred in another cell block and was assigned to the same cell as Plaintiff. (*Id.* ¶ 13; R. 72, Sullivan Dep. Tr. at 22.) Officer Barry, Sergeant Warden, and Lieutenant Sullivan were among the correctional officers on duty in F-House that day. (R. 70, Pl.'s Resp. to Facts ¶¶ 2-4.) The decision to house an inmate in a cell with another inmate is made by a lieutenant, major, placement committee, or other high-ranking official. (*Id.* ¶ 14.) Sergeants and correctional officers do not have authority to determine whether an inmate can have a cellmate or which cell an inmate is placed in. (*Id.*) The decision to assign House to Plaintiff's cell was made by the shift commander, a non-party. (R. 72, Sullivan Dep. Tr. at 21, 36.) Lieutenant Sullivan also personally checked the double-cell binder before taking House to Plaintiff's cell. (*Id.* at 47.) The binder reflected that Plaintiff was approved for double-celling and was eligible to have a cellmate. (R. 70, Pl.'s Resp. to Facts ¶ 15.)

According to Plaintiff, Officer Barry came to his cell and told him that he was "getting a cellie." (R. 56-2, Pl. Dep. Tr. at 47.) Plaintiff responded by telling him that he was "single man status per orders of mental health and internal affairs." (*Id.*) Officer Barry then left and went "back by the office." (*Id.* at 52.) A short time later Sergeant Warden arrived with House and told

Plaintiff that he would be "getting a cellie." (*Id.*) Plaintiff told Sergeant Warden, too, that he was "not allowed to have a cellie per orders of mental health and IA," and to "check the computers," but Sergeant Warden instead walked away to take House to the showers. (*Id.*) A few minutes later Lieutenant Sullivan arrived at Plaintiff's cell and told Plaintiff he was getting a cellmate. (*Id.*) Plaintiff repeated that he was supposed to be on "single man cell status," to which Lieutenant Sullivan responded that Plaintiff was "recommended and available to have a cellie." (*Id.* at 56.) Plaintiff told Lieutenant Sullivan to "check the computer," at which point Lieutenant Sullivan allegedly responded that he didn't "give a damn" and walked away. (*Id.*)

After House finished his shower, Sergeant Warden brought him back to Plaintiff's cell.[4] (*Id.* at 48, 56.) According to Plaintiff, he was sitting on the top bunk reading when House walked into his cell and said to him, "Whatcha going to do?" (*Id.* at 48-49.) Plaintiff did not know House and had never seen him before that day. (*Id.* at 58.) Plaintiff responded, "What you mean [sic] I'm going to do? I'm going to mind my business," and jumped down from his bunk. (*Id.* at 49.) At that point House "threw a swing" at Plaintiff, so Plaintiff "grabbed him" and "[s]lammed him up against the wall." (*Id.* at 61.) He then "held [House] against the wall" until Sergeant Warden came into the cell and deployed a one-second burst of pepper spray.[5] (*Id.* at 62-63; R. 70, Pl.'s

---

[4] There is conflicting evidence in the record regarding whether House was handcuffed when he was being transported to the segregation unit or whether he was unrestrained and carrying a mattress. (*See* R. 72, Sullivan Dep. Tr. at 25, 34, 81; R. 72, Williams Aff. at 16; R. 73, Defs.' Resp. to Add'l Facts ¶ 4.) For purposes of this motion, the Court has accepted Plaintiff's version—that House was not wearing handcuffs when he was brought to the cell. The Court finds this discrepancy non-material, since Plaintiff's claim arises from what happened after House was inside the cell.

[5] "Pepper spray is a commonly used self defense spray. Its active ingredient is oleoresin capsicum, an extract taken from hot pepper plants." *United States v. Maiden*, 606 F.3d 337, 338 n.2 (7th Cir. 2010).

Resp. to Facts ¶¶ 18, 24.)[6] The parties dispute whether Sergeant Warden gave the inmates an

order to stop fighting before deploying the pepper spray. (R. 70, Pl.'s Resp. to Facts ¶ 18; R. 73,

Defs.' Resp. to Add'l Facts ¶¶ 5, 7.) After the pepper spray was deployed, Plaintiff let House go

because, in his words, "the mace overtook me [and] I couldn't see." (R. 56-2, Pl. Dep. Tr. at 63.)

Once Plaintiff released House, both inmates were placed in restraints and Sergeant Warden took

Plaintiff to the showers to wash off the pepper spray. (*Id.* at 64-65; R. 70, Pl.'s Resp. to Facts

¶¶ 23-24.) While Plaintiff was in the shower, a medical technician came to wash the spray from

his eyes. (R. 70, P.'s Resp. to Facts ¶ 21.)

The same day as this altercation, Sergeant Warden and Lieutenant Sullivan completed an

"incident report" stating:

> [O]n the above date and approximate time I/M Weeks and I/M House (S06245)
> were observed fighting in Cell F-130. Both inmates were given several direct
> orders to stop [f]ighting, they failed to comply. A one second burst of OC was
> used to defuse the fight. Once the fight was defused both inmates were cuffed-up,
> given showers and seen by med-tech Josephine.

(*Id.* ¶ 23.) On September 28, 2013, Plaintiff was served with a disciplinary report completed by

Sergeant Warden, which stated:

> [O]n the above date and approx time this R/Sgt. observed I/M Weeks (N22850)
> attack I/M House (S06245) immediately after I/M House was secured in Cell F-
> 130. Both inmates were given several direct orders to stop fighting. They refused
> to comply causing a one second burst of OC (pepper spray) to be deployed to
> defuse the situation. Both inmates were cuffed taken to shower and given medical
> treatment by med tech[.]

---

[6] Plaintiff makes a general denial of Defendants' paragraph 18, which states: "Inmate House and Plaintiff
ignored direct orders to stop fighting, causing a one second burst of OC (pepper spray) to be deployed to
defuse the situation, and the inmates were separated, placed in restraints and provided with medical
attention." (R. 57, Defs.' Facts ¶ 18.) However, in support of his denial, the only evidence Plaintiff cites
to is his own deposition, wherein he describes the altercation with House. (R. 70, Pl.'s Resp. to Facts ¶ 18
(citing R. 72, Pl. Dep. Tr. at 57).) It is clear that there is a dispute about whether Plaintiff was given an
order to stop fighting before Sergeant Warden deployed the pepper spray, but Plaintiff has not pointed to
any evidence establishing a genuine dispute over the amount of pepper spray used or the actions taken by
Defendants after it was deployed. Therefore, the Court deems this proposed fact to be admitted, other than
the portion related to whether "Inmate House and Plaintiff ignored direct orders to stop fighting."

(*Id.* ¶ 24.) A disciplinary board found Plaintiff guilty of three offenses: "Assaulting Any Person," "Fighting," and "Disobeying a Direct Order." (*Id.* ¶ 25.) As the basis for its decision, the board wrote, "Per unit F double cell form Weeks N22850 is cleared to have a cellmate." (*Id.* ¶ 26.) As a result of these infractions, Plaintiff lost certain privileges and was required to serve additional time in segregation. (R. 56-2, Pl. Dep. Tr. at 70.)

A few weeks after this incident, Plaintiff was transferred to another correctional facility. (*Id.* at 73; R. 56-5, Movement History at 2.) He subsequently filed a grievance against Defendants complaining that they had put House in his cell when he was not supposed to have a cellmate. (R. 56-1, Grievance Form at 14; R. 70, Pl.'s Resp. to Facts ¶ 27.) IDOC's administrative review board denied the grievance stating, "Cell reviews are conducted prior to placement by review board, C/O's have no control over placement." (R. 70, Pl.'s Resp. to Facts ¶ 27.)

Plaintiff admits that he did not suffer any physical injuries as a result of his altercation with House, other than that House "nicked [him] in the nose" when trying to punch him. (*Id.* ¶ 20.) Plaintiff explained that he "moved [his] head away before [House] could really connect the punch." (R. 56-2, Pl. Dep. Tr. at 61.) Plaintiff did not need any medical care as a result of this altercation. (R. 70, Pl.'s Resp. to Facts ¶ 21.) He admits that he received medical treatment for the pepper spray in the form of a shower and assistance from the medical technician in washing his eyes. (*Id.*) Once he took a shower he no longer had any problems seeing, but he continued to have some irritation on his skin, which went away after a few days. (R. 56-2, Pl. Dep. Tr. at 72.)

**PROCEDURAL HISTORY**

In June 2015, Plaintiff filed a *pro se* complaint under 42 U.S.C. § 1983 alleging constitutional claims against Defendants. (R. 1, Compl.) After various amendments to the

complaint, Plaintiff asserts three claims: (1) Defendants failed to protect him in violation of the Eighth Amendment when they placed House in his cell notwithstanding his single cell status, causing him to be attacked by this inmate; (2) Sergeant Warden used excessive force against him in violation of the Eighth Amendment when the sergeant deployed pepper spray without an adequate justification; and (3) Defendants violated his First Amendment rights by placing House in his cell and spraying him with pepper spray in retaliation for a prior altercation he had with Defendants, and for him "writing grievances against their co-workers."[7] (R. 11, Am. Compl.; R. 70, Pl.'s Resp. to Facts ¶¶ 6-8.)

Defendants now move for summary judgment on the entirety of the complaint, arguing that Plaintiff has failed to come forward with sufficient evidence to support any of his three claims. (R. 55, Mot.) After the motion for summary judgment was filed, the Court recruited *pro bono* counsel to represent Plaintiff.[8] (R. 60, Order.) Counsel conducted additional discovery and filed a response to the motion for summary judgment. (R. 72, Resp.) Thereafter, Defendants filed a reply in support of their motion. (R. 74, Reply.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[7] Plaintiff originally named additional defendants, but they were dismissed in a prior order. (R. 10, Order.)

[8] The Court expresses its thanks to attorney Laura Marie Maul of Esp Kreuzer Cores LLP for serving as appointed counsel in this matter.

moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding the motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I.    Failure to Protect

Plaintiff first claims that Defendants violated his Eighth Amendment rights when they failed to protect him from House. (R. 70, Pl.'s Resp. to Facts ¶ 6.) Under the Eighth Amendment, prison officials have an obligation to protect inmates from "violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). Nevertheless, prisons are inherently dangerous places: "Inmates get there by violent acts, and many prisoners have a propensity to commit more. Guards cannot turn away persons committed by the courts; nor do individual guards have any control over crowding and other systemic circumstances." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). Thus, "[a] prison official is liable for failing to protect an inmate from another prisoner only if the official knows of and disregards an excessive risk to inmate health or safety." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (citation and internal quotation marks omitted).

A failure-to-protect claim has both an objective and subjective component. *Id.* On the objective prong, "the harm to which the prisoner was exposed must be an objectively serious one." *Id.* To meet this standard, "the allegedly dangerous prison condition must deprive an inmate of the minimal civilized measure of life's necessities." *Christopher v. Buss*, 384 F.3d 879,

882 (7th Cir. 2004) (citation and internal quotation marks omitted). "[A] beating suffered at the hands of a fellow detainee" clearly meets this standard. *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). On the subjective prong, "the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Gevas*, 798 F.3d at 475 (citation and internal quotation marks omitted). "Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (citation omitted). In other words, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Del Raine v. Williford*, 32 F.3d 1024, 1032 (7th Cir. 1994) (citation omitted). Instead, the deliberate indifference standard "approaches intentional wrongdoing" and is comparable to "criminal recklessness." *Burton*, 805 F.3d at 784 (citation omitted). "If the harm is remote rather than immediate, or if the officials don't know about it or can't do anything about it," the subjective element is not satisfied. *Del Raine*, 32 F.3d at 1038 (citation omitted). Because more than a general risk of harm is required to prove an Eighth Amendment failure-to-protect claim, complaints to prison officials "that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas*, 798 F.3d at 480-81. By contrast, a complaint "that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481.

Even accepting Plaintiff's version of events as true, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's failure-to-protect claim. To satisfy the first prong, Plaintiff must have evidence that he was exposed to an objectively serious harm. *Gevas*, 798 F.3d at 480. This is a high standard: "An objectively sufficiently serious risk is one that society considers so grave that to expose *any* unwilling individual to it would offend contemporary standards of decency." *Christopher*, 384 F.3d at 882 (internal citations and quotation marks omitted). Although a "beating suffered at the hands of a fellow detainee" satisfies this standard, *Brown*, 398 F.3d at 910, here the record shows that Plaintiff and House had only brief scuffle lasting a minute or two, which did not cause Plaintiff any physical injuries or necessitate medical treatment. (R. 56-2, Pl. Dep. Tr. at 61, 70.) Under these circumstances, Plaintiff has failed to show that he was subjected to a harm serious enough to satisfy the objective prong.

On the subjective prong, the evidence fails to show that Plaintiff made a complaint to Defendants that identified "a specific, credible, and imminent risk of serious harm" prior to his altercation with House. *Gevas*, 798 F.3d at 481. In fact, according to Plaintiff's own version of events, he did not identify *any* actual risk to his safety when he spoke to Defendants. Instead, he merely told them that he was supposed to be on single-man cell status. There could be many reasons unrelated to safety why an inmate might be housed by themselves (such as where he or she has a communicable disease), and there was nothing in Plaintiff's statements to specifically alert Defendants that Plaintiff would be in physical danger if they put House in his cell. *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (concluding that prisoner's "vague statements that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play"); *Butera v. Cottey*, 285 F.3d 601, 606 (7th

Cir. 2002) (holding that prisoner's general statement that he was "having problems" in his cellblock and "needed to be removed" was not sufficient to put prison officials on notice of a threat to his safety). Indeed, Plaintiff admitted at his deposition that he did not know House, had no prior problems with him, and had never even seen him before this incident. (R. 56-2, Pl. Dep. Tr. at 58.)

Plaintiff argues that his mental health records show that "he had issues that were not conducive to having a cellmate." (R. 72, Resp. at 2.) This is not the standard for proving an Eighth Amendment failure-to-protect claim, but in any event, the records he points to actually suggest that it was *he* who posed a risk to other inmates. In a session with a counselor in April 2013, Plaintiff apparently expressed thoughts of "killing [his] cellie" and felt he had little to lose because he was already serving a life sentence. (R. 72, Mental Health Progress Note at 13.) A month later he was seen again and reported feeling better; the counselor noted that as of that date Plaintiff was "single celled." (*Id.* at 14.) Nothing within this document shows that anyone from the mental health unit *ordered* that Plaintiff be single-celled, or that any staff member determined that housing him with another inmate posed a risk to his own safety. In fact, records show that Plaintiff had a cellmate in July 2013, which was after he made the comment to his counselor about doing harm to his cellmate. (*See id.* at 13; R. 56-3, Double-Cell Assessment at 4.) There is nothing in the record to reflect that any problems arose when Plaintiff was housed with another inmate during that period.

It may be that Plaintiff's comments to his counselor should have triggered a formal reevaluation of Plaintiff's double-cell status by the placement committee, but that was a matter beyond the scope of Defendants' duties, and they cannot be held liable for the actions or omissions of other prison staff. *See Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009)

("[P]ublic employees are responsible for their own misdeeds but not for anyone else's."). As to Defendants, the record is devoid of evidence showing that they had access to Plaintiff's mental health records or that they were otherwise aware of this information when they put House in Plaintiff's cell.

Although Plaintiff told Defendants that he was supposed to be single-celled, they were not required to simply take him at his word. They were entitled to consider that prisoners can be "manipulative" and might "cry 'wolf' in an effort to have a cell to themselves or choose a favored cellmate." *Riccardo*, 375 F.3d at 525; *see also Estate of Miller v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017) ("Prisoners can be manipulative, using deceit to obtain advantages; guards are accordingly entitled to be skeptical."). Guards have the difficult job of "discriminat[ing] between serious risks of harm and feigned or imagined ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day's work." *Riccardo*, 375 F.3d at 525. The law does not require that guards "perform this task flawlessly." *Id.* Instead, "[a]ll that can be expected is that guards act responsibly under the circumstances that confront them." *Id.*

The record shows that lower-level officers like Officer Barry and Sergeant Warden have no authority to decide where an inmate is placed; their job is simply to carry out the orders of higher-ranking officials. (R. 70, Pl.'s Resp. to Facts ¶ 14; R. 56-4, Warden Decl. ¶ 4.) In fact, they would be disciplined for changing an inmate's cell assignment. (R. 72, Sullivan Dep. Tr. at 16.) Lieutenants have some authority to change an inmate's placement, at least on a temporary basis, but Lieutenant Sullivan personally checked the double-cell binder and it showed that Plaintiff was formally approved to have a cellmate by the placement committee, which included

a member of the mental health staff.[9] (*Id.* at 17, 21, 36, 101; R. 56-3, Double-Cell Assessment at 3.) A subsequent investigation confirmed that Plaintiff was in fact eligible to have a cellmate on the date in question. (R. 70, Pl.'s Resp. to Facts ¶ 26.)

It is also worth noting that House's arrival in the segregation unit was not part of a planned movement. Instead, he was brought to the unit in the early morning hours—when the placement office was closed—due to an incident that occurred in another cell block. (R. 72, Sullivan Dep. Tr. at 17-18, 21-22.) The record is devoid of evidence to show that Defendants had actual knowledge that House was dangerous or likely to attack Plaintiff if he was put in his cell. Notwithstanding Plaintiff's statements about his single-cell status, Lieutenant Sullivan had documentation showing that Plaintiff was formally approved to have a cellmate. (R. 56-3, Assessment Form at 3.) He therefore carried out the order of the shift commander to put House in Plaintiff's cell. A brief altercation ensued, but it was quickly quelled by correctional officers

---

[9] Plaintiff points out that Lieutenant Sullivan's affidavit is somewhat awkwardly worded and states that he "would have" reviewed the double-cell binder before putting House in Plaintiff's cell and that it showed Plaintiff was eligible to have a cellmate. (R. 56-3, Sullivan Decl. ¶ 4.) To the extent there is any ambiguity in the affidavit, Lieutenant Sullivan testified definitively at his deposition that he personally looked at Plaintiff's double-celling form before House was placed in his cell. (R. 72, Sullivan Dep. Tr. at 47.) Plaintiff misconstrues Lieutenant Sullivan's deposition testimony in stating that he did not actually check the double-cell binder and instead simply "presumed that was done." (R. 71, Pl.'s Add'l Facts ¶ 6.) Lieutenant Sullivan's testimony was that the normal procedure was for the shift commander to check the prison's computerized "Offender Tracking System" to ensure that an inmate could be double-celled before making an assignment. (R. 72, Sullivan Dep. Tr. at 33-35.) He testified that he did not personally see the shift commander do that before assigning House to Plaintiff's cell but presumed that it was done. (*Id.* at 33.) He further testified that he did not have access to a computer at that time but he personally checked the double-cell binder and it showed Plaintiff was approved for a cellmate. (*Id.* at 33, 47.) Plaintiff has offered nothing to rebut this testimony. The Court therefore does not find any actual dispute on this issue.

and the two inmates were separated.[10] (R. 56-2, Pl. Dep. Tr. at 48-49, 62-63.) Under these circumstances, no reasonable jury could find that Defendants were deliberately indifferent to an excessive risk to Plaintiff's safety when they put House in his cell. For these reasons, Defendants are entitled to summary judgment on this claim.

## II.   Excessive Force

Plaintiff next claims that Sergeant Warden used excessive force against him when he sprayed him with pepper spray during the altercation with House. (R. 70, Pl.'s Resp. to Facts ¶ 7.) The use of force is considered excessive under the Eighth Amendment only when it "entails the 'unnecessary and wanton infliction of pain.'" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 667-68 (7th Cir. 2012) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). When force is used "in the course of resolving a disturbance" within a prison, the relevant inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 668 (citation omitted). "Factors relevant to that inquiry include whether jail officials perceived a threat to their safety and the safety of other inmates, whether there was a genuine need for the application of force, whether the force used was commensurate with the need for force, the extent of any injury inflicted, and whatever efforts the officers made to temper the severity of the force they used." *Id.* The use of a chemical agent is proper under the Eighth Amendment when it is "reasonably necessary to . . . subdue

---

[10] Plaintiff submits an affidavit from House prepared in 2015 in which he somewhat confusingly attests that "under no circumstances did [Plaintiff] assault me or attack me as Sgt. Warden and Lt. Sullivan are contending." (R. 72, House Aff. at 17.) The circumstances under which Plaintiff obtained this affidavit are unclear, but it appears that House may have been trying to clarify that Plaintiff did not hit or otherwise injure him during the altercation. This is consistent with Lieutenant Sullivan's account that the two appeared to be "wrestling" rather than "fighting." (R. 72, Sullivan Dep. Tr. at 66-67.) Regardless, Plaintiff testified under oath at his deposition that a physical altercation occurred between him and House on September 22, 2013, during which House tried to punch him and he pushed House up against the wall. (R. 56-2, Pl. Dep. Tr. at 61-62.) The Court has accepted Plaintiff's version of how this incident unfolded, but there is no actual dispute that a physical altercation occurred between the two inmates on the date in question.

recalcitrant prisoners." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). The use of a chemical agent will violate the Eighth Amendment only if it is used "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Id.* To survive summary judgment on an excessive force claim, "the prisoner must have evidence that will support a reliable inference of wantonness in the infliction of pain." *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (citation and internal quotation marks omitted).

Applying those standards, the Court concludes that Sergeant Warden is entitled to summary judgment. The undisputed facts show that Sergeant Warden was faced with a rapidly evolving situation in which two inmates were engaged in a physical altercation inside their cell. One or both of them could have been injured if the fight continued. "A fight among two inmates certainly poses a danger to the inmates involved as well as the jail officials who must intervene to stop it." *Rice*, 675 F.3d at 668 (affirming officer's use of pepper spray to break up a fight). Sergeant Warden used a modest amount of pepper spray to break up the fight. (R. 70, Pl.'s Resp. to Facts ¶ 24.) This method was effective: by Plaintiff's account, he let go of House because the pepper spray "overtook" him. (R. 56-2, Pl. Dep. Tr. at 48.) At that point, the inmates were restrained and separated, and Plaintiff was immediately taken to the shower and given medical assistance to wash the pepper spray out of his eyes. (R. 70, Pl.'s Resp. to Facts ¶ 21.) He had

some skin irritation for a few days but otherwise suffered no lasting effects.[11] (R. 56-2, Pl. Dep. Tr. at 72.)

Plaintiff apparently believes that Sergeant Warden should have entered the cell and tried to physically separate him and House before deploying the pepper spray, (R. 72, Resp. at 4), but the Eighth Amendment did not require Sergeant Warden to put his own safety at risk before resorting to the pepper spray. *Soto*, 744 F.2d at 1270; *see also Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) ("Jails are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners."). Plaintiff also argues that Sergeant Warden failed to give him a proper warning before using the pepper spray,[12] (R. 72, Resp. at 4), a point which Defendants vigorously dispute, (R. 74, Reply at 7). But even accepting Plaintiff's account, it is unclear why a warning would be needed in this situation. It was not as if Plaintiff was engaging in some

---

[11] To the extent Defendants are suggesting that being sprayed with pepper spray is a *de minimis* injury for which the Eighth Amendment provides no remedy, the Court disagrees. (*See* R. 56, Mem. at 7-9.) A prisoner need not suffer significant injury to have an Eighth Amendment claim; the wanton infliction of pain will suffice. *Hendrickson v. Cooper*, 589 F.3d 887, 891 (7th Cir. 2009). The force involved here was far more than a simple shove or "malevolent touch," which is ordinarily the type of force found to be *de minimis*. *Id.* Although the effects of pepper spray are temporary, it is known to cause "intense pain." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 726 (7th Cir. 2013); *see also Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (observing that pepper spray causes: "(1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth.").

[12] The Court has considered that a prison disciplinary board found Plaintiff guilty of disobeying a direct order in connection with this incident, which could trigger concerns under *Heck v. Humphrey*, 512 U.S. 477 (1994). *See Edwards v. Balisok*, 520 U.S. 641, 646-48 (1997) (*Heck* precluded inmate from asserting a claim under Section 1983 that would necessarily imply the invalidity of a prison disciplinary conviction). However, the *Heck* bar is an affirmative defense that must be pleaded and proved by Defendants. *See Oliver v. Pfister*, 655 F. App'x 497, 499 n.1 (7th Cir. 2016); *Kramer v. Vill. of North Fond du Lac*, 384 F.3d 856, 862-63 (7th Cir. 2004). Defendants did not assert an affirmative defense based on *Heck* in their answer, nor do they argue *Heck* in their summary judgment filings. (*See* R. 16, Ans.; R. 56, Mem.; R. 74, Reply.) If *Heck* were to apply, it would preclude Plaintiff from arguing that he did not disobey a direct order from Sergeant Warden to stop fighting and would provide additional support for granting summary judgment to Sergeant Warden.

innocuous pursuit when the pepper spray was used, such that he would have been surprised by the use of the spray. Instead, he was engaging in behavior that violated prison rules and posed an obvious threat to other inmates and staff. *See Rice*, 675 F.3d at 667-68; *see also Mitchell v. Krueger*, 594 F. App'x 874, 876 (7th Cir. 2014) (observing that prisoner created a "safety risk" by fighting with another inmate and "cannot complain that [the defendant] took decisive steps to subdue him"). Even if, as Plaintiff argues, House "started" the fight, Sergeant Warden owed a duty to protect both House and Plaintiff, and he could not simply stand by and watch them injure each other. *See Mitchell*, 594 F. App'x at 876.

As to Plaintiff's argument that other means existed for trying to break up the fight, the Supreme Court has cautioned that substantial deference must be afforded to prison staff when they are addressing matters of institutional safety and security. *Whitley*, 475 U.S. at 321-22. As the Court explained:

> When the ever-present potential for violent confrontation and conflagration ripens into actual unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight. Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Id.* at 321-322 (internal citations and quotation marks omitted). Before an excessive force claim can go to trial, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.* at 322. Put simply, "[u]nless it appears that the evidence, viewed in the light most favorable to

the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." *Id.* Given the circumstances under which force was used in this case, Plaintiff has not satisfied that standard.

Plaintiff also argues that Sergeant Warden's use of pepper spray did not comport with the requirements of the Illinois Administrative Code. (R. 72, Resp. at 3-4; *see also* R. 71, Pl.'s Add'l Facts ¶¶ 8-10.) Sergeant Warden disputes this, (R. 73, Defs.' Resp. to Add'l Facts ¶¶ 8-10), but the Court need not resolve their dispute. Whether Sergeant Warden complied with state administrative requirements is immaterial to Plaintiff's Eighth Amendment claim. *See Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) ("Regardless of a plaintiff's insistence that a defendant failed to follow state law, the mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an actionable § 1983 claim."); *Sanders v. Fredricks*, No. 10 C 5714, 2016 WL 8711472, at *7 (N.D. Ill. Jan. 8, 2016) (finding that correctional officers' failure to follow Illinois Administrative Code requirements regarding the use of pepper spray did not establish an Eighth Amendment violation).

In short, the Eighth Amendment did not require Sergeant Warden to use the best possible approach for breaking up the fight, and indeed, "negligence or even gross negligence is not enough." *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (citation omitted). The question is whether there is evidence in the record to create a reliable inference that Sergeant Warden used force "maliciously and sadistically for the very purpose of causing harm." *Rice*, 675 F.3d at 668 (citation omitted). The Court concludes that there is not. The undisputed facts show that Sergeant Warden was faced with a potentially dangerous situation involving a fight between two inmates, and he used a modest amount of force to end it. He took immediate steps to temper the severity of the pepper spray by taking Plaintiff to the showers and obtaining medical assistance to ensure

that the pepper spray was removed from his eyes. The force Sergeant Warden used, while no

doubt unpleasant for Plaintiff, caused him no lasting ill effects. Based on the record, no

reasonable jury could conclude that Sergeant Warden used excessive force against Plaintiff. *See*

*Newton v. Brandenburg*, No. 15 CV 05036, 2017 WL 2985756, at *5 (N.D. Ill. July 13, 2017)

(granting summary judgment for correctional officer on excessive force claim where "the

facts . . . show a quickly evolving situation involving a fight between inmates where one

corrections officer was forced to make quick decisions in order to contain the situation and stop

the fighting"). Therefore, Sergeant Warden is entitled to summary judgment on this claim.

## III.  Retaliation

Plaintiff's final claim is somewhat vague, but in essence he asserts that Defendants

violated his First Amendment rights by placing House in his cell and then spraying him with

pepper spray; he believes these actions were taken in retaliation for a prior "altercation" he had

with Sergeant Warden and Lieutenant Sullivan and for prior grievances he had filed about other

prison employees. (R. 11, Am. Compl.; R. 70, Pl.'s Resp. to Facts ¶ 8.) To prove a retaliation

claim, a plaintiff must establish that: "(1) he engaged in activity protected by the First

Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in

the future; and (3) the First Amendment activity was at least a motivating factor in the

defendants' decision to take the retaliatory action." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th

Cir. 2015) (citation omitted). An inmate's use of a prison grievance system constitutes protected

First Amendment activity, and therefore prison officials cannot retaliate against an inmate for

filing a grievance. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). A prisoner who satisfies

these three elements cannot prevail, however, if the defendants show that they would have taken

the same action for a legitimate reason. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013); *Greene v. Doruff*, 660 F.3d 975, 978-80 (7th Cir. 2011).

Under these standards, Plaintiff has failed to create a triable issue of fact on his retaliation claim. As to the prior "altercation" he had with Sergeant Warden and Lieutenant Sullivan, he makes only vague assertions and provides no evidence to explain what allegedly happened during this incident and when it occurred. Sergeant Warden was never deposed (or at least no one has submitted his testimony to the Court), and Lieutenant Sullivan offered uncontroverted testimony that he never met or interacted with Plaintiff before the incident with House on September 22, 2013. (R. 72, Sullivan Dep. Tr. at 90-91.) Unless this prior "altercation" involved some type of protected First Amendment activity by Plaintiff, it could not form the basis for a viable retaliation claim. *See Perez*, 792 F.3d at 783. Because Plaintiff did not develop this claim, there is no basis in the record for the Court to infer that it did.

Writing grievances would trigger First Amendment protections, *see id.*, but again, Plaintiff makes only broad allegations rather than presenting actual proof. He has provided no details about the prior grievances nor submitted copies of the grievances themselves. The only grievances in the record are the ones he wrote *after* the incident with House. (*See* R. 56-1, Grievances at 14-15.) Thus, it is entirely unclear what Plaintiff was complaining about in his prior grievances, which prison employees he was complaining about, and when these grievances were filed. Without such details, there is no basis for the Court to infer that any of the Defendants were even aware of the grievances—Lieutenant Sullivan testified that he was not, (R. 72, Sullivan Dep. Tr. at 91)—or that there was suspicious timing between the grievances and the incident with House. *See Stewart v. Wall*, --- F. App'x ---, 2017 WL 1806542, at *3 (7th Cir. May 5, 2017) (affirming summary judgment for prison nurse on prisoner's First Amendment

retaliation claim because prisoner needed to present evidence that nurse took adverse action against him because of his grievances, and he "proffered no evidence that the nurse even knew about the grievances"); *LaBoy v. Clements*, No. 15 CV 10771, 2017 WL 2936705, at *8 (N.D. Ill. July 10, 2017) (granting summary judgment to prison staff on prisoner's First Amendment retaliation claim where the record was "entirely devoid of facts that might establish a nexus between LaBoy's protected activity and Defendants' actions").

Indeed, Plaintiff acknowledged at his deposition that he had no evidence of retaliation other than the mere fact that Defendants put House in his cell and then sprayed him with pepper spray. (R. 56-2, Pl. Dep. Tr. at 87.) Plaintiff's "speculation" that Defendants were acting with a retaliatory motive is not enough to defeat summary judgment. *See Turley v. Rednour*, 555 F. App'x 606, 609 (7th Cir. 2014) (affirming summary judgment for defendants on prisoner's First Amendment retaliation claim where plaintiff "conceded that his belief that the defendants had engaged in retaliation rests entirely on the fact that he was not assigned a job"). Additionally, the record provides entirely reasonable explanations for Defendants' actions. Defendants have submitted uncontroverted evidence that it was the shift commander—a non-party—who assigned House to Plaintiff's cell. (R. 72, Sullivan Dep. Tr. at 21-22, 36.) Plaintiff has made no attempt to show that the actual decisionmaker harbored a retaliatory motive. The record also shows that at the time the assignment was made, Plaintiff was formally approved to have a cellmate by the placement committee. (R. 70, Pl.'s Resp. to Facts ¶ 15.) As for the pepper spray, the record shows that it was used because Plaintiff was engaged in an altercation with House, which by Plaintiff's own account involved him pinning House up against the wall until the pepper spray "overtook" him. (R. 56-2, Pl. Dep. Tr. at 63.) Based on the record, there is simply no basis for the Court to infer any retaliatory motive on the part of Defendants. *See Brown v. Phillips*, 801

F.3d 849, 855 (7th Cir. 2015) (affirming summary judgment for prison staff on detainee's First Amendment retaliation claim where the actions of prison staff were "supported by a legitimate reason"). Therefore, summary judgment is granted for Defendants on this final claim.[13]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (R. 55) is GRANTED. The clerk is DIRECTED to enter final judgment in favor of Defendants and against Plaintiff.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: August 7, 2017**

---

[13] Because the Court finds that Defendants are entitled to summary judgment on all claims, it does not reach Defendants' alternative arguments regarding qualified immunity. (*See* R. 56, Mem. at 12.)